IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| GUSTAVO NAVARRETE, | ) |
| --- | --- |
| Plaintiff, | ) |
| vs. | ) Case No. 17-CV-347-SMY-GCS |
| MADISON COUNTY, ILLINOIS, | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

**YANDLE, District Judge:**

Plaintiff Gustavo Navarrete[1] alleges that Defendant Madison County, Illinois ("Madison County") discriminated against him on account of his national origin (Latino) by terminating his employment in violation of Title VII of the Civil Rights Act of 1964. 42 U.S.C. § 2000e-2(a)(1). Pending before the Court is Madison County's Motion for Summary Judgment (Doc. 35). Plaintiff filed a Response (Doc. 39), and Madison County replied (Doc. 42). For the following reasons, Defendant's Motion for Summary Judgment is **DENIED**.

## Background

The following facts are undisputed except where noted. All facts are taken in a light most favorable to Plaintiff Gustavo Navarrete. *National American Ins. Co. v. Artisan and Truckers Cas. Co.*, 796 F.3d 717, 722-23 (7th Cir. 2015).

Navarrete was employed by the Madison County Sheriff's Department – Jail Division, on October 20, 2008 and served as a correctional officer at the Madison County Jail.

---

[1] In his brief, Plaintiff spells his last name "Navarette." Defendants use multiple spellings -- "Navarette," "Navarrette," "Navarratte." Plaintiff's Amended Complaint spells his name "Navarrete" as do the employment documents and deposition transcript attached to the motions before the Court. Therefore, the Court will use the latter spelling.

When Navarrete was interviewed for his job, his ability to speak Spanish was raised and he agreed that he would translate when necessary (Doc. 35-5, p. 22). Prior to his termination, Navarrete was tasked with translating from Spanish to English whenever the need arose at the jail. He translated during intake, booking, and nurse call times (Doc. 39-2, pp. 6-8). From October 2010 to January 2013, he translated during Court proceedings conducted by video-conference in the jail's library (Doc. 39-1, pp. 4). On one occasion, he was taken just outside the jail to the parking lot or road by Patrol Officer Hernandez to translate for 1 of 7 arrestees located in a police van (Doc. 35-3, p. 12). He was not given a bullet-proof vest or gun even though the other officers at the scene had guns and vests. Captain Dixon also took Navarrete to Granite City, Fairmont City, and another town to translate without providing him with protective gear. Navarrete was not given additional compensation or benefits for providing translation services (Doc. 39-1, p. 10). Every time he was asked to translate, Navarrete explained that he is not a translator and that there are many Spanish dialects (Doc. 39-1, p. 5-6). He was concerned that he might translate incorrectly during medical screenings and judicial proceedings. He complained to Sergeant Hill, Sergeant Court, Captain Bost, Captain Bunt, and "anyone who would listen to [him]" that he did not want the responsibility of translating or to be taken away from his regular duties in order to translate (Doc. 39-1, p. 6). On one occasion, when he refused to translate for a nurse, he was falsely "written up" the next day by Sergeant Court who made a comment about his accent while doing so (Doc. 39-1, pp. 7-8). In February 2013, Navarrete had a heated conversation with Major Wells about translating and was told that he was not required to translate any more (Doc. 39-1, p. 14). Then Sheriff Hertz met with Navarrete on February 26, 2013 and inquired why he no longer wanted to translate (Doc. 39-1, pp. 21-22). Navarrete was required to translate even after this conversation

(Doc. 39-1, pp. 15, 32). There is no evidence that Sheriff Lakin, who replaced Hertz, had any discussions with Navarrete about translating.

Navarrete was subjected to offensive comments related to his ethnicity. Once he was accused of lying when he said he did not understand a Spanish-speaking person (Doc. 39-1, p. 25). When he was a patrolman, his field training officer would make fun of his accent, but Navarrete never reported the incident (*Id*. 26-7). While at the jail, he was subjected to various offensive comments which he did report, including references to "his people" doing yard work, asking him to speak so that others could understand (i.e. a commentary on his accent), referring to him and "his kind" as illegal immigrants, commenting "imagine that" when he was spotted eating food from Taco Bell, and calling him "speedy Gonzalez" (Doc. 39-1, pp. 66-67). In response to these comments, Navarrete walked away (e.g. Doc. 39-1, p. 29).[2]

After Navarrete was assured by Sheriff Hertz that steps would be taken to ensure additional training to staff regarding diversity (Doc. 39-1, pp. 67-68), an incident occurred involving a dispatcher named "Richards" who Navarrete had never met before. In July 2013, when Navarrete handed him a paper, Richards said "gracias" (while giggling) to which Navarrete replied that he would "beat his ass the next time with a smile on his face" (Doc. 39-1, pp. 34, 55). Navarrete believed saying "gracias" was a continuation of the verbal harassment he had experienced earlier, which the Sheriff assured him would end (Doc. 39-1, p. 34).[3] As a result, Navarrete filed a Charge with the EEOC regarding Richards' comment (Doc. 39-1, p. 56) and Sheriff Hertz recommended that Navarrete be discharged because the threat directed to Richards (Doc. 39-1, p. 57-8). By August 1, 2013, however, Navarrete withdrew the EEOC Charge and apologized to Richards in

---

[2] These comments were made by other correctional officers, sergeants, and lieutenants. It is unclear from the record whether any of the persons making comments were his supervisors.
[3] The "speedy Gonzalez" comment occurred after the discussion with the Sheriff (Doc. 39-1, p. 40-41).

exchange for the withdrawal of the recommendation that his employment be terminated (Doc. 39-1, p. 59). During this time period, Navarrete was also counseled by this immediate supervisors and Sheriff Hertz about his unfriendly attitude towards his co-workers (Doc. 39-1, pp. 64-71). There is no evidence that any additional offensive comments were made after 2013.

On August 17, 2015, Navarrete's supervisors, Sergeant Ridings and Sergeant Sarhage, issued an employee evaluation report in which they stated:

> Deputy Navarrete [sic] has worked at the Sheriff's Office for 7 years. He has a great work ethic, he takes initiative in doing whatever needs to be done. He also has a great working relations with the staff and detainees. He takes pride in every aspect of the job, from his appearance to his performance. (Doc. 39-2, p. 34).

On November 12, 2015, an inmate, "Govero," accused Navarrete of abusing him, by threatening to pepper spray him, compelling him to wear a wet jumpsuit, and encouraging another inmate to assault him (Doc. 35-1).[4] Navarrete denied the allegations and was placed on administrative leave during an investigation by the Illinois State Police ("ISP"). Neither the Sheriff nor administrative officers asked Navarrete about the incident (Doc. 39-1. p. 49). Navarrete disputes the conclusions of the ISP that he threatened Govero with pepper spray or acted inappropriately, and disputes participation in the honey bun hit (Doc. 39-1, pp. 46, 48).

After the investigation, the Madison County State's Attorney declined to press charges against Navarrete (Doc. 39-3, pp. 10-11). Sheriff Lakin recommended Navarrete's termination in a January 16, 2016 letter to the Sheriff's Merit Commission, citing to a variety of rules violations (Doc. 35-1, pp. 1-2). The letter specifically referred to the November 2015 incident with inmates Govero and Osborn and the August 2013 incident with employee Richards.

Sheriff Lakin terminated Navarrete's employment on February 1, 2016 (Doc. 35-1, p. 3).

---

[4] Plaintiff identifies this as the "honey bun hit." Inmate Govero accused Navarrete of bribing inmate Osborn to beat him up in exchange for 5 honey bun snack cakes.

Prior to terminating Navarrete, Lakin was aware of the conclusions of the ISP and the State's Attorney but had not reviewed their findings (Doc. 39-3, p. 4-5). He also reviewed Navarrete's personnel file and apparently noted admonitions related to his attitude (*Id.*). He did not review Navarrete's employee evaluations or speak to his supervisors (*Id.*). In determining the facts related to the honey bun/shower incident, Sheriff Lakin relied on the reports of either Captain Joseph or Major Connor, who probably got their information from Govero (Doc. 39-3, p. 5). He based his decision to fire Navarrete on the honey bun incident (which includes the events that took place with Govero and the shower) and the 2013 discipline (*Id.*). Navarrete was subject to a Collective Bargaining Agreement and could appeal and/or grieve the termination to the Sheriff's Merit Commission (Doc. 35-1).

## **Discussion**

Summary judgment is proper only if the moving party can demonstrate that there is no genuine issue as to any material fact. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50 (1986). Any doubt as to the existence of a genuine issue of material fact must be resolved against the moving party. *Lawrence v. Kenosha County,* 391 F.3d 837, 841 (7th Cir. 2004).

Title VII prohibits discrimination against an individual as to "compensation, terms, conditions, or privileges of employment, because of such individual's . . . national origin." 42 U.S.C. § 2000e-2(a). Under Title VII, "an unlawful employment practice is established when the complaining party demonstrates that . . . national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." *Id*. § 2000e-2(m). Such disparate treatment can be demonstrated by an employer who treats an individual less

favorably than others because of his national origin. *Raytheon Co. v. Hernandez*, 540 U.S. 44, 52 (2003). "Liability in a disparate-treatment case depends on whether the protected trait actually motivated the employer's decision." *Id.* (quotation marks, editing marks, and citation omitted).

When considering a motion for summary judgment involving a Title VII national origin claim, the Court must determine whether "the evidence would permit a reasonable factfinder to conclude that the Plaintiff's [national origin] caused the discharge or other adverse employment actions." *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).

Here, Navarrete does not claim that Sheriff Lakin or any other person with authority to fire him or influence the terms of his employment stated that his employment was being terminated because he is Latino. As such, to succeed on his claim, he must show that:

> (1) he is a member of a protected class, (2) he performed reasonably on the job in accord with his employer's legitimate expectations, (3) despite his reasonable performance, he was subjected to an adverse employment action, and (4) similarly situated employees outside of his protected class were treated more favorably by the employer.

*David v. Bd. of Trustees of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 225 (7th Cir. 2017) (citations and editing marks omitted). If Navarrete establishes the elements of a *prima facie* case, the burden shifts to Madison County to show that it had a legitimate, non-discriminatory reason for the adverse action. *Id*. If Madison County meets its burden, Navarette must then show that the stated reason is merely a pretext for discrimination. *Id*. There is no question that Navarrete is a member of a protected class and that he suffered an adverse job action. However, there are questions of fact that preclude summary judgment.[5]

---

[5] Because the question of whether Navarrete was meeting the legitimate expectations of his employer and pretext overlap, the Court will consider them together. *Bodenstab v. County of Cook*, 569 F.3d 651, 657 (7th Cir. 2009) ("While the question of pretext arises only after a plaintiff has established a prima facie case of discrimination and the employer has countered with a legitimate non-discriminatory reason for the adverse action, we can skip over the initial burden-shifting of the indirect method and focus on the question of pretext.").

It is undisputed that Navarrete was involved in an incident with an inmate and that he was found to have violated the rules and regulations of the Sheriff's Department, including conduct unbecoming a Deputy Sheriff (Doc. 35-1, p. 2). It is also undisputed that Navarrete was also disciplined for threatening another officer (the "gracias" incident in 2013). Certainly, violating rules and regulations of an employer may be a valid reason for terminating an employee. That said, there is evidence from which a reasonable jury could conclude that the reasons proffered by Madison County for Navarrete's termination were merely pretext for discrimination. Specifically, Navarrete's most recent employee evaluation was positive. And, his immediate supervisor cannot point to any other instance when an employee was terminated based on the statements of an inmate.

There is also evidence that he was required to provide translation services above and beyond his job duties and was subjected to racial/ethnic slurs or commentary. While the Court is mindful that comments that are attenuated in time and not made by a decision maker may not alone raise an inference of discrimination, *See Teruggi v. CIT Group/Capital Finance, Inc.*, 709 F.3d 654, 661 (7th Cir. 2013), this evidence coupled with other evidence may convince a jury that Navarrete was in fact discriminated against on account of his national origin.

Moreover, a jury may find Sheriff Lakin's decision to terminate Navarrete suspect, in light of the State's Attorney's declination to press criminal charges, the ISP's finding of no misconduct, and the circumstances under which he made the decision. Sheriff Lakin did not review the actual findings of the ISP nor did he review Navarrete's employee evaluations or speak to Navarrete about the incident. Instead, he exclusively credited the statements of an inmate. The pretext analysis focuses on the honesty of the employer's explanation, not on whether it was reasonable or appropriate. *Hill v. Tangherlini*, 724 F.3d 965, 968 (7th Cir. 2013).

Finally, Navarrete argues that similarly situated employees were treated more favorably. Another employee is "similarly situated" to him if he is "directly comparable to [him] in all material respects." *Peele*, 288 F.3d at 326 (citation and internal quotation marks omitted). The comparison should not require identical characteristics but should be a "flexible, common-sense examination of all relevant factors." *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012) (citation and internal quotation marks omitted). "[T]he inquiry simply asks whether there are sufficient commonalities on the key variables between plaintiff and the would-be comparator to allow the type of comparison that, taken together with the other prima facie evidence, would allow a jury to reach an inference of discrimination or retaliation . . . ." *Humphries*, 474 F.3d at 405.

According to Navarrete's Affidavit, a year prior to his termination, Officer Poston and Lieutenant Mooshegian, both Caucasian, were involved in a shoving match that was witnessed by Lieutenant Hollenbeck and Sergeant Sarhage (Doc. 39-6). Officer Poston held the same rank, had worked the same number of years, had performed the same duties, had the same supervisor, and was subject to the same Collective Bargaining Agreement as Navarrete. Officer Poston was not disciplined for this incident. Around the same time, Poston and Sergeant Hernandez got into a showing match while undergoing training, with Hernandez threatening to use a "stun gun" on Poston. Neither was disciplined for this incident. A jury could conclude that these employees engaged in similar conduct as Navarrete and could reasonably infer that they were not disciplined because they were not an ethnic or racial minority.

## Conclusion

Viewing the evidence in the record in the light most favorable to Navarrete, the Court finds that a reasonable jury could return a verdict in his favor. Thus, Defendant is not entitled to summary judgment, and this matter shall proceed to trial.

**IT IS SO ORDERED.**

**DATED: September 27, 2019**

**STACI M. YANDLE**
**United States District Judge**