**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| GUSTAVO NAVARRETE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:17-CV-00347-SMY-SCW |
| | ) | |
| MADISON COUNTY, ILLINOIS, | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINITFF'S MEMORANDUM IN SUPPORT OF HIS REQUEST TO AWARD EQUITABLE RELIEF

Comes Now the Plaintiff, by and through his undersigned counsel, and for his Memorandum in Support of his Request to Award Equitable Relief, states as follows:

### I. Equitable Relief Requested

A Title VII victim is presumptively entitled to full relief. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 421, 95 S.Ct. 2362, 2373, 45 L.Ed.2d 280 (1975). Under Title VII, after an employer has been found to have intentionally engaged in an unlawful employment practice, the district court may order back pay, reinstatement, and "any other equitable relief as the court deems appropriate." 42 U.S.C. § 2000e-5(g)(1). The 7th Circuit Court of Appeals has recognized that the following equitable relief is available to Navarette:

A. Back Pay. *See David v. Caterpillar, Inc.*, 324 F.3d 851, 865 (7th Cir.2003) ("The district court has broad equitable discretion to fashion back pay awards to make the Title VII victim whole").

B. Fringe Benefit Losses. *See Pollard v. E.I. du Pont de Nemours & Co*., 532 U.S. 843, 847-48, 121 S.Ct. 1946, 150 L.Ed.2d 62 (2001) (holding that back pay includes lost benefits); *EEOC v. O'Grady*, 857 F.2d 383, 391 (7th Cir.1988) (same).

1

C. Front Pay in lieu of reinstatement. *See Williams v. Pharmacia*, 137 F.3d 944, 952 (7th Cir.1998) ("As the equivalent of reinstatement, front pay falls squarely within the statutory language [of § 2000e-5(g)(1)] authorizing `any other equitable relief.'").

D. Pre-Judgment Interest. *See Shott v. Rush-Presbyterian-St. Luke's Med. Ctr.*, 338 F.3d 736, 745 (7th Cir.2003) (prejudgment interest presumptively available).

E. Tax consequences of a lump sum award. *See E.E.O.C. v. N. Star Hospitality, Inc.*, 777 F.3d 898, 904 (7th Cir.2015) ("Put simply, without the tax-component award, [a plaintiff] will not be made whole, a result that offends Title VII's remedial scheme.").

F. Attorney's Fees. *See Pickett v. Sheridan Health Care Center*, 664 F.3d 632 (7th Cir. 2011).

Navarette requests all of these categories of damages.

**II. Application of Equitable Relief**

A. <u>Back Pay</u>

Once the jury has found that there has been employment discrimination, there is a presumption that the employee is entitled to back pay. *See David*, 324 F.3d at 865; *E.E.O.C. v. Gurnee Inn Corp.*, 914 F.2d 815, 817-18 (7th Cir.1990); *Hutchison v. Amateur Elec. Supply, Inc.*, 42 F.3d 1037, 1044 (7th Cir. 1994). Back pay represents the wages the plaintiff would have earned had he not been fired between the time of the firing and the date of judgment. *See* 7th Cir. Pattern Civil Jury Instruction 3.11 (2015). *See also David v. Caterpillar, Inc.*, 324 F.3d 851, 865 (7th Cir.2003) ("The district court has broad equitable discretion to fashion back pay awards to make the Title VII victim whole.")

a. Benchmark Earnings

Back pay is "the difference between actual earnings for the period and those which she would have earned absent the discrimination by defendant." *Horn v. Duke Homes, Div. of Windsor Mobile*

*Homes, Inc.*, 755 F.2d 599, 606 (7th Cir. 1985). Calculating the difference in pay is "not an exact science," ultimately resting on "a process of conjectures" that are necessarily "imprecise." *Thompson v. Altheimer & Gray*, 2001 WL 1618717, at *2 (N.D.Ill. Dec. 18, 2001) (citations omitted).

Navarette's last full year of pay before he was terminated was 2015. His total earnings according to his W-2 for 2015 were $63,316.98. (Exhibit 39)

At the time of his termination Navarette was subject to a Collective Bargaining Agreement that was in effect from December 1, 2014, until November 30, 2017.  (Exhibit 40)(Exhibit 51, para. 9). As a Jail Officer with 5 to 10 years of experience Navarette was scheduled to have a base salary of $63,059 in 2016 and a base salary of $64,484 in 2017. (Exhibit 40, Appendix A- Wages)(Exhibit 51, para. 9).[1]

Defendant stopped paying Navarette on January 22, 2016.  (Exhibit 41**,** MDS-Navarette-001)(Exhibit 51, para. 10)**.** Three weeks of salary is $3,638.05.[2] ($63,059 per year, $1,212 per week).

Under the Collective Bargaining Agreement with the Sherriff in effect between December 1, 2017, and November 20, 2020, Navarette was scheduled to earn a base salary of $67,953 in 2018[3], a base salary of $71,013 in 2019 and a base salary of $72,608 in 2020. (Exhibit 42) (Exhibit 51, para. 11). There has been no new Collective Bargaining Agreement and as such the 2020 base salary figures still apply. (Exhibit 43) (Exhibit 51, para. 11).

---

[1] Note: The base earnings were calculated by reference of the chart on pages 34 and 35 of Exhibit 40 and then applying the 2.25% wage increase agreed to in the CBA.

[2] Note: This amount was calculated based upon the 2016 base salary, applying the 2.25% wage increase agreed to in the CBA and calculating three weeks of pay..

[3] Had Navarette remained employed with the Sherriff's office as of April 21, 2018, he would have been entitled to the 10-year longevity pay increase. (Exhibit 40, Article 10D- Wages, page 15)(Exhibit 51, para. 10). As such his salary would have changed starting May 1, 2018. Using the 5-year longevity pay rate from January through April 2018 results in $64,982 or $5,415 per month. Using the 10-year longevity pay rate from May through December 31, 2018 results in $45,288 or $5,661 per month.

b. Interim Earnings

The next step is to consider any interim earnings, that is, "wages (or the like) earned by a discriminated upon employee in the period after his discharge but before judgment that, but for the discrimination, would not have been earned." *Chesser v. State of Ill.,* 895 F.2d 330, 337 (7th Cir.1990). Interim earnings "operate to reduce the back pay otherwise allowable." 42 U.S.C. § 2000e-5(g)(1).

Mr. Navarette was able to find employment with the National Archives and earned $8,143.97 in 2016. (Exhibit 44). Mr. Navarette also worked as a self-employed transloator in 2016 and earned $2,087.00.  (Exhibit 25). Mr. Navarette earned $19,730.35 working for the National Archives in 2017. (Exhibit 45).  Mr. Navarette found a higher paying job with the Veteran's Administration and earned $5,031.99 in 2017. (Exhibit 46).  Mr. Navarette earned $24,885.11 working for the VA in 2018.  (Exhibit 47). Mr. Navarette earned $29,115.34 working for the VA in 2019. (Exhibit 48).  Mr. Navarette earned $32,552.00 working for the VA in 2020. (Exhibit 49). Mr. Navarette has earned $19,515.84 working for the VA in 2021 through June 11, 2021. (24 weeks; 46% of the year). (Exhibit 50)(Exhibit 51, paras. 12-18).

There is no suggestion that Navarette failed to mitigate his damages. He was 56 years old at the time of his termination. (Exhibit 51, para. 29). He applied for numerous jobs. (Exhibit 51, para. 30). He looked for employment within his field but was unsuccessful in finding a similar job. (Exhibit 51, para. 31). He found employment in a timely manner. (Exhibit 51, para. 34). It was not nearly at the rate of pay and with the benefits he had with the defendant. (Exhibit 51, para. 35).

c. Resulting Award

Using the amounts referenced above, the chart below shows the back-pay calculation.

|                | 2016     | 2017     | 2018     | 2019     | 2020     | June 11, 2021 |
|----------------|----------|----------|----------|----------|----------|---------------|
| Sherriff       | $63,059  | $64,484  | $67,953  | $71,013  | $72,608  | $33,400       |
| Sherriff Actual| $3,638   |          |          |          |          |               |
| Alternate      | $8,143   | $24,762  | $24,885  | $29,115  | $32,552  | $19,515       |
|                | $2,087   |          |          |          |          |               |
| Difference     | $49,191  | $39,722  | $43,068  | $41,898  | $40,056  | $13,885       |

Accordingly, the total amount of back pay owed to Navarette is **$227,820.00**.

## B. Prejudgment Interest

Prejudgment interest on back pay is awarded to compensate plaintiffs for the loss of the use of money. *Partington v. Broyhill Furniture Industries, Inc.*, 999 F.2d 269, 274 (7th Cir.1993). "[P]rejudgment interest typically accrues from the date of the loss or from the date on which the claim accrued," in this case on January 23, 2016, which is the date Navarette stopped being paid and was terminated. *Am. Nat. Fire Ins. Co. ex rel. Tabacalera Contreras Cigar Co. v. Yellow Freight Sys., Inc.*, 325 F.3d 924, 935 (7th Cir.2003). There is no statutory rate of prejudgment interest; determining an applicable rate is left to the district court's discretion based on individual circumstances, although "the best starting point is to award interest at the market rate, which means an average of the prime rate for the years in question." *Cement Div., Nat'l Gypsum Co. v. City of Milwaukee*, 144 F.3d 1111, 1114 (7th Cir.1998) The prejudgment interest should be compounded monthly. *See Geraty v. Village of Antioch*, 2014 WL 1475574, at *3 (N.D.Ill. Apr. 15, 2014); *see also Am. Nat. Fire Ins. Co.*, 325 F.3d at 938 ("Compound interest generally more fully compensates a plaintiff[.]").

The monthly Bank Prime Loan Rate published by the Federal Reserve from 2016 to the present is perfectly reasonable here. (Exhibit 52)[4] Accordingly, the total prejudgment interest on the back pay in the amount of $227,820.00 up to the date of the anticipated judgment is $57,252.00. (Exhibit 53).

## C. Lost Benefits

A Back Pay award should also include lost benefits. *Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 847-48, 121 S.Ct. 1946, 150 L.Ed.2d 62 (2001) (holding that back pay includes lost benefits); *EEOC v. O'Grady*, 857 F.2d 383, 391 (7th Cir.1988) (same).

1. Sick Leave

Over his seven and a half years of employment Navarette had accumulated 363 hours of Sick Leave time at the time of his wrongful termination. (Exhibit 54, MDS-Navarette-0011) (Exhibit 51, para. 19). According to the Collective Bargaining Agreement currently in effect employees are allowed to accumulate up to 1440 hours of sick leave and that 960 hours may be redeemed at the end of the employee's career at the hourly pay rate prevailing at the time of the employees retirement. (Exhibit 42, Article 16- Sick Leave, p. 23-24) (Exhibit 51, para. 11). Had Mr. Navarette not been wrongfully discharged he intended to work for the Defendant through December 1, 2027, at which time he would have accumulated 20 years of service. (Exhibit 51, para. 36). At the time of his termination Navarette was approximately 37.5% of the way through a twenty-year career. To accumulate 1440 hours at retirement, Navarette would have had accumulated 540 hours by the time he was terminated but in fact he had only accumulated 363

---

[4] Navarette requests that the Court take Judicial Notice of Exhibit 52 which is taken from https://fred.stlouisfed.org/series/DPRIME.  See, *General Electric Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1081 (7th Cir. 1997); *Denius v. Dunlap*, 330 F.3d 919, 926 (7th Cir. 2003)(judicial notice of documents on a governmental website); *Betz v. Greenville Correctional Inst.*, 2014 WL 812403 at *1 (S.D.Il. Mar. 3, 2014); *Laborers' Pension Fund v. Blackmore Sewer Constr., Inc.*, 286 F.3d 600, 607 (7th Cir. 2002).

hours. As such it is assumed, based upon the pace he used sick days during the first seven and a half years of his career, that he would have only accumulated 1,020 hours by the time he had intended on retiring in December 2027. Using the last salary schedule available (FY 2020), his rate of pay with the 15-year longevity increase would have been $74,464.00 or $37.23 per hour. At the rate of $37.23 per hour, the sick leave loss for 960 hours is $35,741.00.

2. Health Insurance

A.    Past Health Insurance Payments

Madison County paid 100% of Mr. Navarette's health insurance premiums and 70% of his dependents health insurance premiums. (Exhibit 42, Article 15- Medical and Hospitalization) (Exhibit 51, para. 11). Mr. Navarette now pays $286.74 every two weeks for family coverage. (Exhibit 55)(Exhibit 51, para. 20). Had Navarette chosen an individual plan he would have paid $116.91every two weeks for his health insurance premiums in 2020 and $123.45 every two weeks in 2021. (Exhibit 55)(Exhibit 51, para. 20). That rate of $123 every two weeks has been chosen all dates of loss.  This rate inures to the benefit of the Defendant in this case because there can be little debate that health insurance costs will increase in the future. At a bi-weekly rate of $123 from October 1, 2017, to August 1, 2021, the total amount is $12,300.00 (200 weeks).

B..    Future Health Insurance Payments

At a bi-weekly rate of $123 from August 1, 2021, until December 1, 2027, the total amount is $21,525.00. (330 weeks).

3.   Pension Loss

Pension loss is a compensable item in order to make Plaintiff whole. *Graefenhain v. Pabst Brewing Company*, 870 F.3d 1198, 1212 (7th Cir. 1989). The court should compare the pension benefits the discharged employee received with the benefits the employee would have

7

received at retirement. *Id.*; *See also, Hagelthorn v. Kennecott Corp.*, 710 F.2d 76, 87 (2d Cir.1983) (court must compare pension benefits discharged employee received with benefits employee would have received at retirement; employer only entitled to deduction for the difference).

Navarette is currently 60 years of age. (Exhibit 51, para. 43). His current life expectancy is 21.7 years. (Exhibit 60).[5]  Navarette intended to work until December 1, 2027. (Exhibit 51, para. 36). Navarette will be 66 at his intended retirement age. (Exhibit 51, para. 36. His life expectancy at age 66 is 17.3 years. (Exhibit 60). Based upon the foregoing Navarette requests 17 years of pension benefits.

Navarette was a member of the IMRF (Illinois Municipal Retirement Fund) when he worked for the Defendant. (Exhibit 51, para. 40). He received a statement of benefits from the IMRF on December 31, 2015, less than a month before he was terminated that indicates that had Navarette worked the 20 years with the Defendant through December 1, 2027[6] as he intended to do, then his pension at age 66 would have been $3,731.00 per month.  (Exhibit 56) (Exhibit 51, para. 41).

As an off-set, in 2016, Navarette's pension with the VA allows for retirement after the age of 62 and a monthly payment equivalent to 1.1% of Navarette's high 3-year average salary. (Exhibit 57)[7]. (Exhibit 51, para. 38). Navarette is scheduled to make $37,293.00 in 2025, $38,423 in 2026 and

---

[5] Navarette requests that this Court take Judicial Notice of the Life Table that is identified as **Exhibit 60. https://www.cdc.gov/nchs/data/nvsr/nvsr70/nvsr70-1-508.pdf.** *See, U.S. v. Bailey*, 97 F.3d 982, 985 (7th Cir. 1996)(BUREAU OF THE CENSUS, UNITED STATES DEPARTMENT OF COMMERCE, *Statistical Abstract of the United States:* 1995 86 (115th ed.1995)); *See also, Kasongo v. U.S.*, 523 F.Supp.2d 759, 790 (N.D.Il. 2007). *https://ftp.cdc.gov/pub/Health_Statistics/NCHS/Publications/NVSR/70-01/*

[6] Navarette had previously purchased and applied several months of military service to his pension and therefore he was eligible to retire with 20 years of service on December 1, 2027. (**Exhibit 51, para. _____**).

[7] Navarette requests that the Court take Judicial Notice of **Exhibit 58** which is taken from https://www.opm.gov/retirement-services/fers-information/computation/.

2027. (Exhibit 58)[8]. (Exhibit 51, para. 42). That average is $38,046.00. 1.1% of that is $419 per month.

Navarette has also participated in a Thrift Savings Plan offered as part of his employment with the VA. (Exhibit 67)(Exhibit 51, para. 28). As of March 31, 2021, that Plan had a value of $28,988.00 The annual rate of return has varied from as low as 4.5% to as high as 11.72%. (Exhibit 67). Along with his employer match, Navarette contributed $2,343 to the account in 2017, $3,711 to the account in 2018, $7,559 to the account in 2020 and $9,839 to the account in 2020. Assuming an annual contribution of $10,000 and an annua 10% rate of return from March 31, 2021, until December 1, 2027. (80 months or 6.6 years) would grow the $29,988.00 as follows:

Year 1 $29,988.00 + $10,000.00 = $39,988.00 x 10% ($3,998) = $43,986.00

Year 2 $43,986.00 + $10,000.00 = $53,986.00 x 10% ($5,398) = $59,384.00

Year 3 $59,384.00 + $10,000.00 = $69,384.00 x 10% ($6,938) = $76,322.00

Year 4 $76,322.00 + $10,000.00 = $86,322 x 10% ($8,632) = $94,954.00

Year 5 $94,954.00 + $10,000.00 = $104,954.00 x 10% ($10,495) = $115,449.00

Year 6 $115,449.00 + $10,000.00 = $125,449 x 10% ($12,544) = $137,993.00

Year 6.6 $137,993.00 + $10,000.00 = $147,993.00 x 6% ($8,880) = **$156,873.00.**

Navarette fully liquidated his contributions to the IMRF Pension earned while employed by Defendant and received $17,813.75 which he rolled over into an IRA. (Exhibit 59).(Exhibit 51, para. 44). As of July 2021, the account was worth $19,821.00. (Exhibit 56)(Exhibit 51, para. 45). The account earns 3.25% interest. (Exhibit 59)(Exhibit 51, para. 24). The account matures in

---

[8] Navarette requests that this Court take Judicial Notice of Exhibit 20 which is the salary schedule found at https://www.opm.gov/policy-data-oversight/pay-leave/salaries-wages/salary-tables/pdf/2021/GS.pdf. (Exhibit 51, para. ____).

in 2023. (Exhibit 59). Assuming an annual 3.25% rate of return from August 1, 2021, until

December 1, 2027. (76 months or 6.33 years) would grow the $19,821.00 as follows:

Year 1 $29,821.00 x 3.25% ($969) = $30,790.00

Year 2 $30,790.00 x 3.25% (1,001) = $31,791.00

Year 3 $31,791.00 x 3.25% (1,033) = $32,824.00

Year 4 $32,824.00 x 3.25% (1,067) = $33,891.00

Year 5 $33,891.00 x 3.25% (1,101) = $34,922.00

Year 6 $34,922.00 x 3.25% (1,137) = $36,059.00

Year 6.33 $36,059.00 x 1.8% (649) = **$36,708.00.**

The total pension loss is **$482,067.00**. That total is calculated as follows:

IMRF Pension $3,731.00 per month for 17 years: $761,124.00

Less

VA Pension $419 per month for 17 years: $85,476.00

VA Thrift Savings Plan: $156,873.00

IMRF Liquidation: $36,708.00

## D.    Front Pay

A. Propriety of an award of Front Pay

Where reinstatement is inappropriate due to unavailability of the position or if the

employer-employee relationship is pervaded by hostility, front pay may be awarded. *Williams v.*

*Pharmacia, Inc.*, *137* F.3d 944, 952 (7th Cir. 1998).  As the equivalent of reinstatement, front pay

falls squarely within the statutory language of § 2000e-5(g)(1) authorizing "any other equitable

relief." *Id.*

Front pay represents the wages the plaintiff would have earned had she not been fired

measured from the date of the judgment to some reasonable point in the future. *See McKnight v.*

*General Motors Corp.,* 908 F.2d 104, 116 (7th Cir. 1990).  There must be evidence of "the length of time the plaintiff expects to work for the defendant" to support a front-pay award. *McKnight v. General Motors Corp.*, 973 F.2d 1366, 1372 (7th Cir. 1992). Plaintiff must show "the length of time the plaintiff expects to work for the defendant". *Id.*  "Front pay is awarded for a reasonable period of time, until a date by which the plaintiff, using reasonable diligence, should have found comparable employment." *Ward v. Tipton County Sheriff Dep't*, 937 F.Supp. 791, 796 (S.D.Ind.1996) (citing *Hutchison v. Amateur Elec. Supply, Inc.*, 42 F.3d 1037, 1045 (7th Cir.1994)).

The job with the Sherriff's office was a job he wanted to turn into a career. (Exhibit 51, para 46). He started his career relatively later in life at the age of 48. (Exhibit 51, para 47). At the time of his termination he was one of the oldest jailers. (Exhibit 51, para. 48). He did so after completing a 20-year career of service in the U.S. Air Force. (Exhibit 51, para. 47). He pursued and obtained his degree in Criminal Justice at St. Louis University while employed for Defendant. (Exhibit 51, para. 49). Had he not been wrongfully terminated Navarette intended to work until December 1, 2027, when reached twenty years of service and turned 66 years of age. (Exhibit 51, para. 36). The primary reason he wanted to work 20 years for the Defendant was for the pension. (Exhibit 51, para. 52). He was eight years into his 20-year plan when he was wrongfully terminated. (Exhibit 51, para. 53). It has been nearly five years since that wrongful termination. (Exhibit 51, para.  54).

Navarette has been unsuccessful finding a comparable job to what he had with the Defendant. (Exhibit 51, para.  55). He is currently earning approximately half of what he earned with the Defendant. (Exhibit 51, para.  56). He applied for numerous jobs. (Exhibit 51, para. 30). He looked for employment within his field but was unsuccessful in finding a similar job. (Exhibit 51, para. 31). He applied for a security job at Scott Air Force Base but did not receive the job. (Exhibit 51, para. 31). That is not surprising in light of the fact that he had to inform prospective employers that he had

been terminated by Defendant for misconduct. (Exhibit 51, para. 32). The fact that he was 56 years

old and looking for an entry level position in his field did not help either. (Exhibit 51, para. 33).

B. Calculation

1. Lost Future earnings

The Defendant is currently working in 2021 under the Collective Bargaining Agreement

in effect from December 1, 2017, to November 20, 2020. (Exhibit 42)(Exhibit 51, para. 11).

Navarette would have had 15 years of service on April 21, 2023. (Exhibit 60, MDS-Navarette-

0013)(Exhibit 51, para. 11). Even though the previous two Collective Bargaining Agreements,

spanning the last 7 years, provides for annual wage increases, no future wage increases are being

used for purposes of this calculation. Instead, the 2020 wages from the Collective Bargaining

Agreement will be used as assumed earnings for 2022 through December 1, 2027. Those wages

are as follows:

**2021:** $36,304 (half of year)
**2022:** $72,608
**2023:** $73,845 (4 mos. at the 10 year experience rate and 8 mos. at the 15 year rate)
**2024:** $74,464
**2025:** $74,464
**2026:** $74,464
**2027:** $68,255 (through December 1, 2027)(Exhibit 42, Appendix A)

2. Interim Earnings

Navarette's earnings with the VA are governed by the "Annual Rates by Grade and Step"

Salary Chart. (Exhibit 51, para. 23 and 42)(Exhibit 58).[9] Navarette is scheduled to make the

following amounts for the VA until December 1, 2027:

2021: $17,343 (half of year)

[9] Navarette requests that the Court Take Judicial Notice of the "Annual Rates by Grade and Step" Salary Chart"
identified as Exhibit 58. It was taken from the opm.gov website.

2022: $36,163
2023: $36,163
2024: $37,293
2025: $37,293
2026: $38,423
2027: $35,221 (through December 1, 2027) (Exhibit 51, para. 23 and 42)(Exhibit 58)

### 3. Resulting Award

Using the amounts decided above, the chart below shows the front-pay calculation:

|  | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 |
|---|---|---|---|---|---|---|---|
| Sherriff | $36,304 | $72,608 | $73,845 | $74,464 | $74,464 | $74,464 | $68,255 |
| Alternate | $17,343 | $35,805 | $35,805 | $36,924 | $36,924 | $38,043 | $34,873 |
| Difference | $18,961 | $36,803 | $38,040 | $37,540 | $37,540 | $36,421 | $33,382 |

Accordingly, the total amount of front pay owed to Navarette is **$238,687.00.**

## E. Reduction of Sick Leave Loss, Health Insurance Loss, Pension Loss and Front Pay Award to Present Value

Navarette requests that the Court apply a 0% net discount rate for purposes of determining the present value of the Sick Leave Loss (payable at retirement of 12/1/27), the future Health Insurance Replacement costs (monthly from date of judgment until date of retirement at 12/1/27), Pension Losses (from date of retirement for 17 years), and Front Pay (annually from date of judgment until date of retirement at 12/1/27). A 0% net discount rate is appropriate. The current Consumer Price

Index, the gold standard for measuring inflation, is currently 5.5%. (Exhibit 62)[10] The current yield on a 20-year Treasury Note is 1.86%. (Exhibit 63)[11]

## F. Tax-Component Award

Navarette asks for a tax-component award to offset the increased tax burden he will incur as a result of receiving a lump sum award. The Seventh Circuit has adopted the availability of such an offset in discrimination cases. *E.E.O.C. v. N. Star Hospitality, Inc.*, 777 F.3d 898, 904 (7th Cir.2015) ("Put simply, without the tax-component award, [a plaintiff] will not be made whole, a result that offends Title VII's remedial scheme.").

Here, Navarette is owed $227,820.00 in unpaid back wages from 2016 to 2021; had Navarette received that amount spread out over the 2016 to 2021 period, he would undoubtedly have paid less in taxes than he will now have to, receiving the wages in a lump sum along with the other damages awarded him in this case, when added to his existing income. This extra tax hit is due to the increased marginal taxation as certain income thresholds are crossed.

According to Navarette, he and his wife, who will be filing jointly, expect to have an income of about $120,000.00 in wages for 2021. (Exhibit 51, para. 58). In addition to that amount, Navarette will have to report $227,820.00 in back pay. That total will put Navarette in the 32% tax bracket. (Exhibit 68)(32% for income over $326,000 but not over $14,700 in 2020).

---

[10] Navarette requests that the Court take Judicial Notice of the U.S. Department of Labor, Bureau of Labor Statistics, Consumer Price Index for June 2021 identified a**s Exhibit 62.** **https://www.bls.gov/news.release/pdf/cpi.pdf.** *Pickett v. Sheridan Health Care Center*, 664 F.3d 632, 648 (7th Cir. 2011)(Judicial Notice of the Consumer Price Index).

[11] Navarette requests that the Court take Judicial Notice of the U.S. Department of Treasury, Daily Treasury Long Term Rate Data identified as **Exhibit 63. https://fred.stlouisfed.org/graph/?id=DGS20,#; https://fred.stlouisfed.org/graph/?id=DFII20,#** *In re Motors Liquidation*, 591 BR 501, 522 (SD New York 2018)(judicial notice of a 30-year treasury interest rate); *In re Federal-Mogul Global*, Bankruptcy No. 01-10578 (RTL), Civil Action No. 05-59 (JHR), (D.De. Aug. 19, 2005)(judicial notice that the Board of Governors of the Federal Reserve System reported the 30 Year Treasury Constant Maturity Rate); *IN RE WALKABOUT CREEK LTD. DIVIDEND HOUSING ASS'N*, 460 BR 567, 574 (Nov. 14, 2001 D.C.).

Had Navarette received the rightful back pay wages in question in the appropriate years, the federal income tax rate applied to him after applying the appropriate standard deduction would have been 22 percent. This contention is supported by Internal Revenue Service tax-rate schedules for those years. (Exhibit 68).[12] Instead, adding the back pay award to what Navarette expects to earn this year will put him in the 32% tax rate instead of 22 percent . (Exhibit 68).

Had Navarette received his $227,820.00 in back pay appropriately and been taxed at the resulting 22 percent rate, his tax liability on this sum would have been $50,124.00 but instead it will be taxed at a 32-percent rate and therefore his actual tax liability will be $72,902.00.

Navarette is accordingly entitled to the differential of $22,782.00 as a tax-component award for the back-pay award.

## G. Attorneys' Fees

Attached are Plaintiff's attorney's fees. (Exhibit 69). Travel expenses have also been included in this request. With respect to attorney travel expenses, the decisions in *Heiar v. Crawford County*, 746 F.2d 1190, 1203 (7th Cir.1984), *cert. denied,* 472 U.S. 1027, 105 S.Ct. 3500, 87 L.Ed.2d 631 (1985), and *Henry v. Webermeier*, 738 F.2d 188, 191-92 (7th Cir.1984), establish that "expenses of litigation that are distinct from either statutory costs or the costs of the lawyer's time reflected in hourly billing rates—expenses for such things as postage, long distance phone calls, xeroxing, *travel,* paralegals and expert witnesses—are part of the reasonable attorney's fee allowed by the Civil Rights Attorney Fees Awards Act." *Heiar*, 746 F.2d at 1203.

**<u>CONCLUSION</u>**

---

[12] Navarette requests that the Court take judicial notice of the Tax Tables that are attached as Exhibit 68.

In summary, and in addition to the sum awarded by the jury, Navarette requests the Court award the following:

1. Back Pay: $227,820.00

2. Prejudgment Interest on Back Pay: $57,252.00

3. Sick Leave Loss: $35,741.00

4. Health Insurance Loss: $33,825.00

5. Pension Loss: $482,067.00

6. Front Pay: $238,687.00

7. Tax Component of Award: $22,782.00

8. Attorney's Fees: $69,425.97

   TOTAL     $1,167,599.97


HOFFMAN & SLOCOMB, LLC


By: /s/ *Paul T. Slocomb*
     Paul T. Slocomb, #6226129
     1115 Locust Street, 4th Floor
     St. Louis, MO  63101
     (314) 436-7800
     Fax (314) 231-0323
     Attorney for Plaintiff


## CERTFICATE OF SERVICE

A copy of the foregoing was served by ECF and sent via e-mail this _5th___ day of August, 2021, to:

Ms. Heidi Eckert
Attorney at Law


/s/ Paul T. Slocomb


16